UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ANTHONY MOREHEAD,

    Plaintiff,

v.                                                                                Case No. 20-cv-1190-bhl

ANGELA THOMPSON, et al,

    Defendants.

## DECISION AND ORDER

Plaintiff Anthony Morehead, who is representing himself, is proceeding on claims that Defendants were deliberately indifferent towards his Achilles injury and were negligent under Wisconsin state law. Dkt. Nos. 21-22. This matter comes before the Court on Defendants' motions for summary judgment and Morehead's motion for a preliminary injunction. Dkt. Nos. 49, 52, & 102. Because no reasonable jury could conclude that Defendants were deliberately indifferent towards Morehead's serious medical needs, the Court will grant the motions with respect to the Eighth Amendment claim, relinquish jurisdiction over the supplemental state law claims, deny as moot the motion for a preliminary injunction, and dismiss this case.

### UNDISPUTED FACTS

Morehead is an inmate at the Redgranite Correctional Institution. Dkt. No. 54, ¶1. Defendants are Dr. Eric Nelson, Health Service Manager (HSM) Angela Thompson, Advanced Practice Nurse Prescriber (APNP) Christine Burnett, Registered Nurse (RN) William Borgen, RN Cindy Barter, and Physical Therapist Robert Rhodes. *Id.*, ¶¶2, 5, 7, & 107; *see also* Dkt. No. 50, ¶¶1-3.

On June 4, 2018, Morehead injured his ankle during a basketball game. Dkt. No. 50, ¶4. At that time, Dr. Adebola Ibirogba (not a defendant) examined the injury and ordered a plan of care consisting of: (1) an x-ray, along with a follow-up appointment to review the x-ray; (2) ice for two weeks; (3) over the counter pain medication; (4) elevation of the ankle; and (5) a Controlled Ankle Motion (CAM) boot for six weeks. Dkt. No. 54, ¶26. Morehead's x-ray (completed on June 7, 2018) showed swelling but no fracture or dislocation, so on June 12, 2018, Borgen ordered Morehead to continue with the plan of care Dr. Ibirogba previously established, including pain medication. *Id.*, ¶¶28-30. At that time, Dr. Ibirogba also updated Morehead's medical "restrictions" to include no work from June 12, 2018 to June 26, 2018 and "light activity—no lifting/pushing/pulling, less than 25 lb" from June 12, 2018 to July 17, 2018. *Id*.

Because Morehead continued to complain of pain, on July 2, 2018, Dr. Ibirogba ordered an MRI to rule out a tear. *Id.*, ¶¶31-32. The MRI (completed on July 12, 2018) showed a "nearly complete retracted tear of the mid Achilles tendon and an abnormal marrow signal within the lateral talar dome, likely degenerative." *Id.*, ¶34. Based on this result, Dr. Ibirogba referred the case to an orthopedic specialist, Dr. Eric Nelson, an off-site doctor. *Id.*, ¶35.

On August 13, 2018, Morehead saw Dr. Nelson for the first time at the doctor's clinic. Dkt. No. 50, ¶6. After a physical examination, Dr. Nelson noted evidence of scar tissue formation along the Achilles. *Id.*, ¶12. He also observed that Morehead could plantarflex with strength of 3+/5, that there was no skin compromise to the ankle, and that Morehead's neurovascular exam was intact. *Id*. Dr. Nelson diagnosed a "subacute Achilles rupture on the left." *Id.*, ¶13. "Subacute" means that the natural healing process was already well-advanced and scar tissue had already started to form. *Id.*, ¶¶16-17. Given that ten weeks had passed between the date of the injury (June 4) and the date of the orthopedic appointment (August 13), Dr. Nelson was not

2

Case 2:20-cv-01190-BHL   Filed 04/14/23   Page 2 of 17   Document 107

surprised that the injury was "subacute." *Id.*, ¶¶21-22. Dr. Nelson explains that, once significant scar tissue has started to form, there is no benefit to surgical repair of an injury, and, in fact, there are clear dangers associated with proceeding with surgical intervention, including potential infection of the surgical wound site. *Id.*, ¶¶23-24. In Dr. Nelson's experience, there is a higher rate of developing infections in the prison population than the non-prison population. *Id.*, ¶25. Based on these considerations, Dr. Nelson recommended the following plan of care:

> "Plan: This will be treated closed. As mentioned, the cast is applied. He should be given crutches. It is difficult to walk in a cast in a plantarflexed position. He should return to the orthopedic clinic in three weeks. The cast will be removed. We will place him back in a removable cast boot at that time."

*Id.*, ¶14. A "closed" treatment is one that does not require surgery. *Id.*, ¶20. Dr. Nelson explains that non-surgical treatment of a ruptured Achilles offers results equal to surgical intervention in all areas, including strength recovery, ankle flexion, and risk of re-rupture. *Id.*, ¶19. This is often true even when the injury is addressed "acutely," meaning right after it occurs. *Id.*, ¶18. Morehead left Dr. Nelson's office that day with a cast, and he had use of crutches and a wheelchair at the institution, along with everything else Dr. Ibirogba had already ordered. Dkt. No. 54, ¶¶26, 35, & 45. The institution also scheduled a follow-up appointment for three weeks. *Id.*, ¶36.

Three weeks later, on September 4, 2018, Dr. Nelson saw Morehead for a second time at his clinic. Dkt. No. 50, ¶28. Dr. Nelson did a physical exam and noted that he could feel scar tissue along the injured portion of the Achilles, that there were no skin complications secondary to the casting of Morehead's left leg, and that Morehead was able to dorsiflex his ankle to neutral. *Id.*, ¶¶29-30. Dr. Nelson concluded that Morehead "was doing as expected" with closed treatment of his Achilles tendon rupture. *Id.*, ¶31. He removed the cast and gave him a removable cast boot. Dkt. No. 54, ¶36. He recommended that Morehead wear the removable cast boot and "weight bear as tolerated;" and that Morehead start physical therapy to work on strike motion and

3

strength. Dkt. No. 50, ¶32. He also recommended a follow up appointment in eight weeks. *Id*.

Per Dr. Nelson's recommendations, Morehead started physical therapy at the institution on September 17, 2018. Dkt. No. 54, ¶¶37-39. At the initial physical therapy appointment, Morehead complained of constant pain through his Achilles (from his calf to his toes) and increased pain when standing and walking. *Id*., ¶40. Rhodes completed an evaluation and created a home exercise program, which included gait training and therapeutic exercises to improve range of motion. *Id*., ¶41. Rhodes provided a Biomechanical Ankle Platform (BAPS) and a Theraband to complete these exercises. *Id*. He instructed Morehead to perform his home exercises three times daily and to weight bear in his removable cast boot as tolerated; he also told Morehead to wean of crutches. *Id*. Rhodes advised rest when needed, ice, compression, along with elevation when needed, and self-massage techniques. *Id*., ¶44. Rhodes also ordered independent access to the Health Services Unit (HSU) physical therapy room three times a week. *Id*. On September 19, 2018, Rhodes issued an additional medical restriction for an ace wrap for his ankle and an ice bag two times a day for pain and swelling. *Id*., ¶43.

Morehead had several more physical therapy appointments between September 24, 2018 and October 15, 2018. *Id*., ¶¶45-50. Morehead continued to complain about pain, but he demonstrated improvement in strength and mobility. *See id*. Rhodes explained to him that physical therapy exercises can cause discomfort and he should proceed as tolerated to improve strength and mobility. *See id*. On September 24, 2018, Morehead was able to tolerate 45 lbs maximum eccentric lowering of heel and Rhodes added standing weight bearing heel raises to strengthen the heel. *Id*., ¶¶45-46. On September 26, 2018 and October 1, 2018, Morehead tolerated 50 lbs on weight training eccentrics and 60-70 lbs on scale concentric weight bearing. *Id*., ¶¶47-49. Rhodes then instructed Morehead to discontinue use of the wheelchair for long

4

distances and to discontinue use of crutches. *Id*. On October 15, 2018, Rhodes ordered a 3/8 inch lift in his right heel to even out his pelvis, which he could use the first two weeks when his boot is removed. *Id*., ¶50.

On October 29, 2018, Morehead filed a Health Services Request (HSR) complaining about continued pain. *Id*., ¶52. He stated that his ankle was not coming along with "scheduled process of healing" and asked for a second opinion regarding treatment options. *Id*. Barter responded by telling him to continue with his physical therapy exercises and noting that the Department of Corrections (DOC) does not authorize second opinions. *Id*. She also stated that he had an appointment with Dr. Nelson coming up and to discuss the issue with him. *Id*.

The next day, on October 30, 2018, Dr. Nelson saw Morehead for a third time at his clinic. Dkt. No. 50, ¶35. Morehead reported that he was still using a cast boot, that he had started physical therapy at the institution, and that he was still experiencing weakness with ankle plantarflexion and strength. *Id*. Dr. Nelson did a physical exam and noted that Morehead had recovered "basically full range of motion" in his ankle, that he could dorsiflex the ankle, that there was scar tissue formation along the Achilles, and that his plantar/flexion strength was 5/5. *Id*., ¶36. Dr. Nelson concluded that Morehead was coming along "as expected" given that it takes a long time to maximally recover plantar and flexion strength following an Achilles injury. *Id*., ¶37. He recommended the following plan of care: (1) discontinue the cast boot and transition back into standard footwear; (2) work on recovery of the ankle plantar and flexion strength in therapy; and (3) follow-up off-site to the Waupun Orthopedic Clinic, "as needed," if there were new issues. *Id*. On November 2, 2018, Borgen reached out to Rhodes to tell him that Dr. Nelson recommended continued physical therapy to work on strength and to wean off the walking boot into normal footwear. Dkt. No. 54, ¶58.

5

Morehead had more physical therapy appointments between November 5, 2018 and November 21, 2018. *Id.*, ¶¶59-63. On November 5, 2018, Morehead tolerated 75-80 lb eccentric loading. *Id.*, ¶59. Morehead reported he had stopped wearing his boot on the unit (as instructed by Dr. Nelson on October 30, 2018), so Rhodes discontinued the boot. *Id.* Morehead's left ankle strength was now 80-90% but his plantar flexion was beginning to plateau at 65%. *Id.* Rhodes encouraged eccentric exercise for Morehead's calf through the home exercise program and advised that he should independently use the physical therapy room. *Id.* On November 7, 2018, Morehead tolerated 89-100 lb eccentric loading. *Id.*, ¶60. At that appointment, Morehead reported that, for the past two days, he was now walking in regular shoes. *Id.* On November 21, 2018, Morehead tolerated 120-130 lb eccentric loading and demonstrated gait without the use of an assistive device. *Id.*, ¶62. He also reported infrequent pain of 7/10 but confirmed that his pain was usually 0/10. *Id.* Rhodes continued to encourage home exercise and to increase walking activities outdoors and to use the treadmill with 10-minute intervals for 20 to 30 minutes. *Id.*

Thereafter, between December 17, 2018 and April 24, 2019, Morehead filed five HSRs related to his Achilles injury. *Id.*, ¶¶64-65. In response, he saw nurses who encouraged him to continue with his plan of care and ordered appointments with Advanced Care Providers (ACP) for further evaluations. *Id.* Morehead received an additional prescription for capsaicin topical cream for pain at some point during this time period. *Id.*, ¶68. None of the defendants in this case were involved in providing care in response to the five HSRs.

On April 17, 2019, Morehead submitted an HSR stating that his physical therapy was over and requesting an ankle brace. *Id.*, ¶66. Barter referred the request to Rhodes, who responded that an ankle brace requires a doctor's orders. *Id.*, ¶¶66-67. On April 25, 2019, Morehead saw a nurse and reported that his capsaicin topical cream took the edge off for a while, but it was not

enough to control the pain. *Id*., ¶68. In response, he was given an ice bag for pain and reminded about his plan of care. *Id*. He also had an appointment scheduled for May 16, 2019. *Id.*

On May 16, 2019, Morehead saw Burnett for the first time. *Id*., ¶70. HSU staff had reported to her that Morehead already had various prescriptions and implements for his Achilles injury and pain, and that Morehead was not properly using the items as prescribed. *Id*. Burnett nevertheless ordered a "functional evaluation," to be completed by correctional staff on unit, to independently determine Morehead's ability to move around the unit. *Id*. Later that day, Morehead filed an HSR requesting orthopedic shoes. *Id*., ¶71. Thomas responded that he had a scheduled appointment with a nurse on May 22, 2019 and a nurse practitioner on June 3, 2019, and to discuss the request then. *Id*. Unit Manager Schroeder later completed the "functional evaluation" on May 31, 2019 and he reported that Morehead was a maintenance worker, who appeared to function well on the unit. *Id*., ¶72.

Morehead saw Burnett for a second time on June 3, 2019. *Id*., ¶73. He stated that he felt his Achilles tendon had not healed properly. *Id*. She ordered a second "functional evaluation." *Id*. That evaluation concluded that Morehead "doesn't have any obvious limitations. He has a maintenance job and participates in physical activity." *Id*., ¶74. But given that Morehead was still complaining about pain, Burnett ordered a second MRI. *Id*. Later, in mid-June 2019, Morehead was fitted with orthopedic shoes, per his special needs request. *Id*., ¶76.

On July 15, 2019, Morehead completed his second MRI. *Id*., ¶¶77-78. Burnett explains that she is not an orthopedic specialist, so she ordered a follow up appointment with Dr. Nelson to review the results. *Id*. She also ordered additional physical therapy to evaluate the need for a brace. *Id*., ¶79. On August 8, 2019, Morehead sent a letter to Thompson asking for surgery to fix his Achilles injury. *Id*., ¶80. Two weeks later, on August 17, 2019, Morehead submitted an

7

HSR stating that there was "pulling" from the back of his Achilles. *Id*., ¶82. In response, Barter scheduled a sick call appointment and ordered rest, ice, compression, and elevation. *Id*. As nurses, neither Thompson nor Barter could order surgery. *Id*., ¶104.

On August 21, 2019, Dr. Nelson's office received a call from the institution seeking follow up recommendations based on the July 2019 MRI. Dkt. No. 50, ¶39. Dr. Nelson reviewed the MRI and concluded that there was no evidence of any re-rupture of the left Achilles tendon. *Id*., ¶40. He noted successful healing of the Achilles by "closed" (i.e. non-surgical) means. *Id*., ¶45. He continued recommending conservative treatment and physical therapy given there was no new injury. *Id*., ¶41. The following day, on August 22, 2019, Borgen entered a medical restriction consisting of no work, no recreation, no weight room, and low bunk effective August 22, 2019 to September 21, 2019. Dkt. No. 54, ¶83.

On August 28, 2019, Morehead told Burnett that rheumatology specialists were encouraging surgery. *Id*., ¶84. Burnett could not find anything in Morehead's medical chart confirming such a statement, but she nevertheless requested that the scheduling coordinator look into referral possibilities and ordered a third "functional evaluation." *Id*. She told Morehead that, if his activity was not impinged, she thought conservative measures were preferable to seeing another specialist regarding his ankle. *Id*. That same day, on August 29, 2019, Morehead submitted another HSR stating that his Achilles tendon hurts and requested access to crutches and a wheelchair. *Id*., ¶85. Barter fitted and dispensed a CAM walking boot the following day and gave him educational material on rest, ice, compression, and elevation. *Id*., ¶¶85-87. On August 29, 2019, HSU staff told Morehead that Dr. Nelson did not recommend surgical repair. *Id*., ¶86.

Morehead had several more physical therapy appointments in September 2019. *Id*., ¶¶88-95. On September 11, 2019, Morehead demonstrated full range of motion of his left ankle and

otherwise normal ankle strength with manual muscle testing. *Id.*, ¶90. However, Morehead was upset that he was not having surgery because he felt he had a ruptured Achilles. *Id.*, ¶¶88-90. Rhodes explained that the MRI did not show a ruptured Achilles. *Id.*, ¶90. Rhodes then gave the option to use the boot or a brace, and Morehead left the appointment with both. *Id.*, ¶91. The following week, on September 16, 2019, Morehead arrived in physical therapy wearing the ankle brace inside his boot. *Id.*, ¶92. Rhodes told him that the boot was unnecessary given that he was using the brace, and to return the boot in two days after weaning off of it. *Id.* At that visit, Morehead had full range of motion and good strength except his plantar flex was 60% guarded with weight bearing due to "disuse weakness." *Id.*, ¶93. Rhodes told him that if he was willing to get off the boot and wear the brace as needed, then he could sign up for independent use of the physical therapy room. *Id.* At that point, Morehead expressed anger that the surgeon would not operate. *Id.*, ¶94. On September 18, 2019, Morehead went to physical therapy and was neither wearing a boot nor a brace. *Id.*, ¶95. He opted to keep the brace rather than the boot. *Id.* The ankle brace was then approved for two to three more months but it was recommended that he wean off the brace. *Id.* Rhodes reviewed home exercises and approved independent use of the physical therapy room for one additional month. *Id.*

On October 6, 2020, Morehead had a telemedicine appointment with Dr. Nelson during which he complained about persistent pain along the Achilles. Dkt. No. 50, ¶44. Dr. Nelson examined his ankle via video and noted that there was an obvious visual difference in the size of the left calf compared to the right, that he could actively dorsiflex his left ankle about 5 degrees past neutral, and that he had active plantarflexion, equal to the other side. *Id.*, ¶47. Dr. Nelson concluded that Morehead's ongoing complaints related to incomplete functional recovery and incomplete rehabilitation. *Id.*, ¶48. He recommended the following treatment:

> "Plan: I think he should get back in physical therapy to work on strengthening. For completeness, I see no downside in obtaining a second opinion from an orthopedic foot and ankle specialist. In my opinion, I do not think that this case would benefit from consideration of surgery such as tendon transfer. However, I see no harm in obtaining a second opinion regarding consideration of that potential treatment option.
>
> We can leave further follow-up with the Waupun Orthopedic Clinic on an as needed basis in the event of some new acute orthopedic issue."

*Id.*, ¶49.

On December 18, 2020, Dr. Nelson's office received one final call from the institution seeking recommendations on leg bracing and leg support options. *Id.*, ¶50. Dr. Nelson recommended against bracing because immobilization was the opposite of what Morehead needed—Morehead needed to strengthen his ankle not immobilize it. *Id.*, ¶52. Dr. Nelson also found out that the institution did not refer Morehead for a second opinion as he had suggested. *Id.*, ¶51.

About a year later, on December 22, 2021, Morehead completed a third MRI which showed "remote extensive tearing of the Achilles tendon." Dkt. No. 90-1 at 11. Orthopedic Surgery Resident Brad Foulke reviewed the MRI at some point in 2022 and "place[d] a case request for left Achilles Tendon debridement, possible repair with or without allograft, FHL transfer, possible proximal Achilles/Gastroc lengthen v gastric turndown and other procedures as indicated." Dkt. No. 106-1 at 5. Dr. Foulke explained,

> "We discussed that the next conservative step would be to have [Morehead] fitted for a custom AFO with dorsiflexion blocking mechanism. We strongly recommended this to him prior to undergoing surgical management, which would include likely FHL transfer, possible allograft. In the setting of his mixed connective tissue disorder, we explained that he is a much higher risk of wound healing issues/infection, which in a worst case scenario could lead to amputation. We also explained that surgical management would not make him 'normal' or restore his normal function, but it could help him to gain some strength in the plantar flexion of his foot. Furthermore, it would likely do little to help resolve his pain."

*Id*.  It's unclear from the record whether Morehead was actually scheduled for surgery based on Dr. Foulke's request, but according to Morehead, on February 8, 2023, Dr. Gilbert Steffanides (not a defendant) "cancelled" the surgery because "it would be too complicated." Dkt. No. 105 at 2.

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The party asserting that a fact is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## ANALYSIS

The Eighth Amendment proscribes "deliberate indifference to serious medical needs of prisoners" amounting to "the unnecessary and wanton infliction of pain." *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 614 (7th Cir. 2022) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). To

11

survive summary judgment, Morehead must point to evidence that: (1) he suffered an objectively serious medical condition; (2) the defendants in question knew of the condition and was deliberately indifferent to treating him; and (3) this deliberate indifference injured him. *Id*. "Deliberate indifference occupies a space slightly below intent and poses a 'high hurdle and an exacting standard' requiring 'something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Id*. at 615. Indeed, Morehead must show that Defendants' medical decisions were "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008) (quoting *Collignon v. Milwaukee County*, 163 F.3d 982, 988 (7th Cir. 1998)). Morehead must show "no minimally competent professional" would have treated him as Defendants did. *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). Mistakes in medical judgment, and even negligence, are insufficient to support a claim of deliberate indifference. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016).

For purposes of this motion, the parties do not dispute that Morehead's Achilles injury was an objectively serious medical need. *See e.g. Petties v. Carter*, 836 F.3d 722 (7th Cir. 2016). But no reasonable jury could conclude that Defendants were deliberately indifferent towards treating it. To the contrary, the undisputed evidence shows that Morehead received constant and appropriately escalating medical care for his Achilles injury from the time it occurred on June 4, 2018 to present. Morehead's plan of care included an x-ray, three MRIs, at least six off-site appointments with two different orthopedic specialists (Dr. Nelson and Dr. Foulke), numerous in-person appointments at HSU, pain medication (both oral and topical), ice bags, a wheelchair, crutches, a cast, a boot, Biomechanical Ankle Platform (BAPS), a Theraband, orthopedic shoes,

an ace wrap, numerous medical restrictions, several rounds of physical therapy, and independent use of the physical therapy room. The record shows that Morehead's condition showed objective improvement through physical therapy (his load tolerance went from 45lbs to 130lbs); and that he was given pain medication (both oral and topical) to relieve his subjective pain. Morehead reported that the pain medications worked, at least in the short term, and he arrived at his last few physical therapy appointments without wearing a boot or brace. In sum, Morehead received almost every treatment available to him at the institution (except surgery) and he does not genuinely dispute that he received all of the medical care Defendants outlined.

That leaves the primary dispute in this case: Morehead's desire for tendon-repair surgery to address the issue of continued pain. Morehead claims that Defendants' failure to order surgery, even though he has been in pain since June 2018, amounts to deliberate indifference. He points out that Dr. Foulke did ultimately place a request for tendon-repair surgery sometime in 2022 following his third MRI. *See* No. 106-1 at 5.

With respect to HSM Thompson, RN Borgen, RN Barter, and Physical Therapist Rhodes, there is no dispute that they provided every treatment ordered by Dr. Nelson and Burnett; and they did not have the authority to override the medical decisions of a doctor or an advanced care provider to order surgery themselves. Dkt. No. 100 at 2-3. Based on these facts, Thompson, Borgen, Barter, and Rhodes are entitled to summary judgment on the Eighth Amendment claim.

With respect to Dr. Nelson, he did not recommend surgery based on his medical opinion that the benefits of surgery on an Achilles injury that had already started to heal was not outweighed by the serious risk of infection, especially in the prison context. He noted that non-surgical treatment of an Achilles injury provided results equal to surgical intervention in all areas, including strength recovery, ankle flexion, and risk of re-rupture, and Morehead's examinations

13

Case 2:20-cv-01190-BHL    Filed 04/14/23    Page 13 of 17    Document 107

showed improvement through conservative treatment. Morehead's second MRI also did not show any new injuries or re-ruptures requiring a change in treatment plan. Therefore, Dr. Nelson continued recommending conservative treatment through physical therapy to strengthen the surrounding muscles and improve function.

The Court notes that Dr. Nelson's medical opinion is also consistent with Dr. Foulke's opinion that he "strongly recommended" conservative treatment (specifically, AFO with dorsiflexion blocking mechanism) because "in the setting of [Morehead's] mixed connective tissue disorder…he is a much higher risk of wound healing issues/infection, which in a worst case scenario could lead to amputation." Dkt. No. 106-1 at 5. Dr. Foulke explained that "surgical management would not make [Morehead] 'normal' or restore his normal function, but it could help him to gain some strength in the plantar flexion of his foot." *Id*. This statement squares with Dr. Nelson's recommendation to continue physical therapy to strengthen surrounding muscles and improve function. Although Dr. Foulke did ultimately request surgery *after* strongly recommending conservative treatment, he did so based on Morehead's preference for surgery, while also noting that "it would likely do little to help resolve his pain." Dkt. No. 106-1 at 5.

Inmates are not entitled to the medical care of their choosing, *see Walker v. Wexford Health Sources, Inc.,* 940 F.3d 954, 965 (7th Cir. 2019) ("[A]n inmate is not entitled to demand specific care"), and in this case, surgery would likely do little to resolve the specific issue Morehead seeks the surgery for (his complaints of pain). Based on these facts, no reasonable jury could conclude that Dr. Nelson's medical decision to recommend conservative treatment was such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that he actually did not base the decision on such a judgment. To the contrary, Dr. Foulke made basically the same recommendation.

14

Case 2:20-cv-01190-BHL   Filed 04/14/23   Page 14 of 17   Document 107

With respect to Burnett, she did not get involved in the case until one year after the injury, but she nevertheless independently reviewed the injury by ordering another MRI, ordering three functional evaluations to determine the status of the injury, and re-referring the case to Dr. Nelson based on the new MRI she ordered. Burnett states that she relied on Dr. Nelson's opinion that the benefits of surgery did not outweigh the risks, and as noted above, that decision was reasonable given Dr. Foulke's similar recommendation *and* Morehead's connective tissue disorder that complicated his injury and his request for surgery. Although Morehead claims that his doctors from UW Rheumatology, who treated his connective tissue disorder, also encouraged surgery, *see* Dkt No. 88, Burnett could not find any such statement in is medical records, nor has Morehead attached any medical evidence to his Declaration showing that recommendation. Morehead's uncorroborated hearsay assertions that they made such recommendations are not enough at summary judgment. Moreover, even if Morehead had attached medical evidence, at best, it would amount to a difference in opinion among doctors about a course of treatment. Such differences in opinion are not deliberate indifference. *See Johnson v. Dominguez*, 5 F.4th 818, 826 (7th Cir. 2021). Under these circumstances, the record confirms Burnett reasonably deferred to the specialist doctor (Dr. Nelson) to determine the need for surgery. The Court notes that Morehead still has at least one conservative treatment option left (AFO with dorsiflexion blocking mechanism), which he unreasonably rejected in favor of requesting surgery that he was warned likely would do little to resolve his complaints of pain. And the "disuse weakness" he still had as of his last physical therapy appointment is still within his own capacity to fix through strengthening exercises he received.

Based on the totality of the record, no reasonable jury could conclude that Defendants were deliberately indifferent towards Morehead's Achilles injury and they are entitled to summary

judgment on the Eighth Amendment claim. Given that Defendants are entitled to summary judgment on the Eighth Amendment claim, the Court will relinquish jurisdiction over his supplemental state law claims. *Leister v. Dovetail, Inc.*, 546 F.3d 875, 882 (7th Cir. 2008) (noting that "when the federal claim in a case drops out before trial," a district court usually "relinquish[es] jurisdiction over any supplemental claim to the state courts."). The Court will also deny as moot Morehead's motion for a preliminary injunction because he did not succeed on the merits of the case. The Court will dismiss this case.

## CONCLUSION

For the reasons stated above, **IT IS HEREBY ORDERED** that Defendants' motions for summary judgment (Dkt. Nos. 49 & 52) are **GRANTED**; Plaintiff's motion for a preliminary injunction (Dkt. No. 102) is **DENIED** as moot; and this case is **DISMISSED**. The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin on April 14, 2023.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge

This order and the judgment to follow are final. Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $505.00 appellate filing fee regardless of the appeal's outcome. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court. *See* Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious. *See* 28 U.S.C. §1915(g). If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serous physical injury. *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The Court cannot extend these deadlines. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.